**E-Filed: 02.22.10**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>vs.<br><br>CHRISTINE DANIEL,<br><br>            Defendant. | CASE NO. CR 09-00993 MMM<br><br>ORDER DENYING DEFENDANT'S MOTION TO STRIKE SURPLUSAGE FROM INDICTMENT |

  Defendant Christine Daniel is charged with two counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2, and two counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2. The indictment contains a fifth count that seeks forfeiture under 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C), and 21 U.S.C. § 853.

  Daniel has moved to strike as surplusage paragraphs 10, 11, 13, 14, 15, 25, 28, 29 and portions of paragraph 19 under Rule 7(d) of the Federal Rules of Criminal Procedure. Each of these paragraphs addresses the details of Daniel's interaction with certain victims, as well as the purchase of a tablet pulverizer. Daniel argues that "[t]he . . . paragraphs are not relevant to the

counts in the indictment. They are prejudicial and inflammatory."[1] Daniel also seeks to strike count five of the indictment, which alleges criminal forfeiture. She contends that "Count 5 is improper and does not disclose any violation of any law, statute or regulation by the defendant."[2]

## I.  FACTUAL BACKGROUND

The indictment alleges that Daniel was a licensed physician and surgeon doing business as Sonrise Wellness Center, Inc., Sonrise Medical Clinic, Inc., Medical Treatment Options of America, Inc., and Christine Daniel M.D., Inc. (collectively "Sonrise").[3] Daniel allegedly developed a product that was labeled, described, and promoted under a variety of names, including "C-Extract," "the natural treatment," and "the herbal treatment" (collectively, "the herbal product").[4] The indictment alleges that Daniel and employees working at her direction falsely represented that the herbal product could cure or treat certain diseases, including cancer, multiple sclerosis, stroke, Alzheimer's Disease, Parkinson's Disease, diabetes, and hepatitis.[5] Daniel and her employees purportedly claimed falsely that the lowest strength herbal product cured cancer 60% of the time while that the highest strength herbal product cured cancer more than 80% of the time.[6] The indictment asserts that Daniel used her status as an ordained Pentecostal minister to create a bond of trust and affinity with patients that allowed her to market, promote, and sell the herbal product throughout the evangelical Christian community.[7] In addition to shipping the herbal product to customers throughout the United States, Daniel frequently

---

[1] Motion to Strike Surplusage in Indictment ("Motion"), Docket No. 17 (Nov. 2, 2009) at 3.

[2] *Id.*

[3] Indictment, Docket No. 1 (Sept. 29, 2009), ¶ 1.

[4] *Id.*, ¶ 3(a).

[5] *Id.*, ¶ 3(b).

[6] *Id.*, ¶ 3(c).

[7] *Id.*, ¶¶ 2, 3(f).

recommended that customers travel to the Sonrise facility in California to receive daily herbal treatments.[8] Depending on the strength of the product, Daniel charged between $750 and $4,270 for one week's worth of herbal product.[9] The indictment asserts that, contrary to Daniel's representations to customers, the herbal product did not have a 60-80% cancer cure rate, was not made of herbs from around the world, and was not manufactured in a laboratory according to each patient's specifications.[10]

To market the herbal product, Daniel allegedly created the website www.sonrisewellnesscenter.com, which offered "C-Extract" for sale to cancer patients and the website www.freeofcancer.com to advertise and promote Daniel's "Medical Treatment Options of America" and to facilitate patients wishing to make appointments at the Sonrise facility.[11] The indictment alleges that on December 10, 2001, Daniel caused one of her employees to place an advertisement for Medical Treatment Options of America in a Los Angeles area newspaper. The advertisement stated in part: "Do you or someone you know have CANCER, Parkinson's Disease, Alzheimer's Disease, MS, Stroke, Heart Disease . . . . Have you come to the end of your treatment road? Why should you die before your time?" The advertisement listed the telephone number and address of the Sonrise facility.[12]

On December 5, 2002, Daniel promoted the herbal product during a television program broadcast on a prominent Evangelical Christian network, and represented: (1) "We have seen miracles"; (2) "We have seen the dead raised"; (3) "We have an array of herbs we use. We're a clinic, an Evangelical clinic. We combine prayer and herbs. We practice what we call King Hezekiah alternative medicine"; (4) "We have our own laboratory"; (5) "We make our own

---

[8] *Id.* ¶¶ 3(g)–(h).

[9] *Id.*, ¶ 3(i).

[10] *Id.*, ¶ 4.

[11] *Id.*, ¶¶ 5-6.

[12] *Id.*, ¶ 12.

3

herbs"; (6) "We have a collection of herbs from around the world and the best areas from every nation"; (7) "The herbs come in levels I-IV depending on what the patient wants"; (8) "We have people today, Stage IV-B cancers, across the nation, that are living today because of our treatment"; (9) "We have a 60% cure rate for the lowest level [herbal product] we have"; (10) "We have people with bone metastasis, lung metastasis, metastasis to the pericardium, we have a lady from Michigan, she had a Stage IV-B spread of the breast cancer to her brain. Within two weeks, the tumor mark drop to normal"; (11) "We work with hepatitis C, we work with diabetes, [and] neuromuscular"; and (12) the herbal treatment could cure hepatitis C.[13] In the weeks following her television appearance, Daniel instructed her employees to tell those calling in response to the interview that the Level VI and VII herbal product had an 80% cure rate for cancer.[14]

The indictment alleges the following interactions with customers or potential customers that Daniel has *not* moved to strike:

(1) that on August 20, 2001, Daniel met with C.L., who had been diagnosed with metastatic breast cancer, at the Sonrise facility, and told C.L. that she had a treatment made from the finest herbs in the world that would attack C.L.'s cancer and get rid of it; and that C.L. died in March 2002;[15]

(2) that on December 5, 2002, after being diagnosed with metastatic colon cancer, W.P. saw Daniel's television interview, and traveled from her home in Kansas to the Sonrise facility in January 2003, where Daniel told W.P. that her cancer medicine was made from the herbs of 23 different countries and that she prepared the medicine in a lab at her residence; that W.P. and her husband paid thousands of dollars to purchase the herbal

---

[13]*Id.*, ¶ 17.

[14]*Id.*, ¶ 18.

[15]*Id.*, ¶ 9.

4

product; and that W.P. died in 2006;[16]

(3) that on January 9, 2003, Daniel offered to sell J.C., who had been diagnosed with colon cancer, five bottles of "Level 4 C-Extract" for $12,225 per month; and that on January 30, 2004, J.C.'s health insurance paid Daniel $10,050 for the purchase of five bottles of "C3 C-Extract" and one package of "SC Powder";[17]

(4) that on September 11, 2003, after being diagnosed with breast cancer, R.M. and her husband telephoned Daniel; that on September 16, 2003, they traveled to the Sonrise facility where Daniel told them that she mixed herbs from around the world and called the herbal product "botanical chemotherapy" that had all the components of chemotherapy without the negative side effects; that R.M. and her husband paid thousands of dollars to have the herbal product shipped to their home in Texas; and that R.M. subsequently died;[18]

(5) that on October 2, 2003, the daughter of M.A., who had developed metastatic melanoma, telephoned Daniel; that Daniel told her that the "C-Extract" medicine was made by Daniel from herbs obtained in Europe; that the daughter and other family members paid thousands of dollars to have the herbal product shipped to M.A. in Minnesota; and that M.A. died on November 19, 2003.[19]

The following are the allegations Daniel *has* moved to strike:

(1) that Daniel caused the herbal product to be sent to W.P., referenced *infra*, on four dates in 2004;[20]

(2) that in October 2001, after being diagnosed with metastatic breast cancer, P.M. and her husband telephoned Daniel; that Daniel told them that the basic cancer program was

---

[16]*Id.*, ¶ 19.

[17]*Id.*, ¶ 21.

[18]*Id.*, ¶ 22.

[19]*Id.*, ¶ 23.

[20]*Id.*, ¶ 19.

six months in length, that chemotherapy would do P.M. no good, and that P.M.'s husband needed to bring P.M. to the Sonrise facility; that the couple traveled to the facility, where Daniel told them that the herbal treatment would shrink P.M.'s tumors and kill her cancer cells; that P.M. and her husband paid thousands of dollars for the herbal product; and that P.M. died in April 2002;[21]

(3) that on December 4, 14, and 20, 2001, Daniel sold the herbal product to H.L.F., representing that it was a "cancer therapy";[22]

(4) that on December 17, 2001, B.D. after being diagnosed with metastatic breast cancer, traveled to the Sonrise facility, where Daniel told her that she had a cancer cure, that she made the cure herself in a laboratory, that each patient received a different level of the product, and that the treatment would make B.D.'s cancer disappear; that B.D. and her family spent thousands of dollars for the herbal product; and that B.D. died on March 26, 2002;[23]

(5) that on January 31, 2002, Daniel caused one of her employees to purchase a tablet pulverizer for use in making the herbal product;[24]

(6) that on April 1, 2002, after their daughter was diagnosed with metastatic medulloblastoma cancer, L.K. and R.K. met with Daniel; that Daniel sold them a product that purportedly cured cancer for which she charged $3,237.50; and that their daughter died on July 3, 2002;[25]

(7) that on November 5, 2003, D.H. met with Daniel regarding fibroid tumors; that Daniel told D.H. she had cures for cancer, but did not normally deal with patients that did not

---

[21]*Id.*, ¶ 10.

[22]*Id.*, ¶ 11.

[23]*Id.*, ¶ 13.

[24]*Id.*, ¶ 14.

[25]*Id.*, ¶ 15.

6

have cancer; that Daniel gave D.H. a price list for the herbal product; and that D.H. paid thousands of dollars for the herbal product;[26]

(8) that on December 17, 2003, after being diagnosed with metastatic colon cancer, J.M. and her husband met with Daniel at the Sonrise facility; that Daniel told J.M. she used natural herbs from different parts of the world to make her cancer treatment, which had curative properties; that the herbs were designed to attack the growth of cancer, reduce the size of the tumor, and cause the death of cancer cells; that J.M. and her husband paid more than $100,000 for the herbal product; and that J.M. died on June 2, 2004;[27] and

(9) that by deceiving victims and making misrepresentations to induce them to pay money for the product, Daniel and her employees induced approximately 55 victims to send in excess of $1.1 million to the Sonrise facility.[28]

## II. DISCUSSION

### A. Standards Governing Motions To Strike Surplusage From An Indictment

"Upon the defendant's motion, the court may strike surplusage from the indictment or information." FED.R.CRIM.PROC. 7(d). Surplusage is language that "goes beyond alleging elements of the crime." *United States v. Jenkins*, 785 F.2d 1387, 1392 (9th Cir. 1986). While surplusage is not *per se* improper, "[t]he inclusion of surplusage must not be allowed to prejudice a defendant in the context of his case." *Id.* Thus, a court will exercise its discretion to strike surplusage from an indictment where necessary "to protect a defendant against 'prejudicial or inflammatory allegations that are neither relevant nor material to the charges.'" *United States v. Terrigno*, 838 F.2d 371, 373 (9th Cir. 1988) (quoting *United States v. Ramirez*, 710 F.2d 535, 544-45 (9th Cir. 1983)); see also *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) ("Motions to strike surplusage from an indictment will be granted only where the challenged

---

[26] *Id.*, ¶ 25.

[27] *Id.*, ¶ 28.

[28] *Id.*, ¶ 29.

allegations are not relevant to the crime charged and are inflammatory and prejudicial" (internal citations and quotation marks omitted)). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Id.* (quoting *United States v. DePalma*, 461 F.Supp. 778, 797 (S.D.N.Y. 1978)). See also *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998) ("[A] motion to strike surplusage from the indictment should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial"); *United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006) ("[I]nformation that is prejudicial, yet relevant to the indictment, must be included for any future conviction to stand and information that is irrelevant need not be struck if there is no evidence that the defendant was prejudiced by its inclusion").

The burden of showing that surplusage should be stricken as inflammatory and/or prejudicial rests with the defendant. See *United States v. Edwards*, 72 F.Supp.2d 664, 667 (M.D. La. 1999) ("the court should not grant a defendant's motion to strike surplusage as prejudicial unless it is clear that the information is not relevant and is prejudicial"). Whether to grant a motion under Rule 7(d) is a decision that rests in the discretion of the district court. *Terrigno*, 838 F.2d at 373 (citing *United States v. Poore*, 594 F.2d 39, 41 (4th Cir. 1979)).

**B.     Whether Paragraphs in Count One Should Be Stricken as Surplusage**

Defendant moves to strike various paragraphs alleging interactions with certain customers and prospective customers as well as a paragraph regarding the purchase of a tablet pulverizer. Defendant does not assert that the paragraphs are misleading or confusing. Indeed, she offers no argument beyond the conclusory assertion that the allegations are prejudicial and inflammatory. The government counters that individual facts concerning the victims are probative of their susceptibility to Daniel's scheme and the culpable state of mind Daniel possessed when she told individual victims, for example, that chemotherapy would not help them, and that she could save their lives in exchange for thousands of dollars.[29]

---

[29] Government's Opposition to Motion to Strike Surplusage in Indictment ("Opp."), Docket No. 35 (Feb. 10, 2010).

8

Defendant does not clearly articulate why the paragraphs she seeks to strike are prejudicial or inflammatory, and the court notes they are identical in many respects to other paragraphs describing interactions with patients that defendant has not moved to strike.

Where allegations in an indictment describe evidence that is admissible and relevant, it is not proper to strike those allegations. *United States v. Mulder*, 273 F.3d 91, 100 (2d Cir. 2001); *Terrigno*, 838 F.2d at 37. In *Mulder*, the Second Circuit considered paragraphs "generally describ[ing] the tactics and purposes of labor coalitions" in connection with prosecution charging a Hobbs Act conspiracy involving labor unions and organized crime. *Mulder*, 273 F.3d at 99-100. The Second Circuit held that general information regarding the tactics and goals of labor coalitions, and their links to organized crime, was "background information that was properly admissible and relevant," the district court did not err in declining to strike the allegations regardless of their inflammatory or prejudicial nature.

Here, to prove mail and wire fraud, the government must prove both a scheme to defraud and intent to defraud. Specifically, the government must prove "a scheme or artifice to defraud, . . . using or causing the use of the mails or wires in order to further the fraudulent scheme." *United States v. Manion*, 339 F.3d 1153, 1156 (9th Cir. 2003) (citing *United States v. Munoz*, 233 F.3d 1117, 1129 (9th Cir. 2000); see also *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992) (noting that the elements of mail and wire fraud are the same). The government must show specific intent to defraud, *Manion*, 339 F.3d at 1156; *Munoz*, 233 F.3d at 1129, which requires that the government show "defendant intended to defraud an identifiable individual." *United States v. Milwitt*, 475 F.3d 1150, 1156 (9t6h Cir. 2007). Thus, evidence tending to prove that Daniel executed a scheme to defraud and intended to defraud identifiable victims is admissible and relevant to meet the government's burden of proof on the first four counts of the indictment. The allegations Daniel seeks to strike plead facts that tend to prove both of these necessary elements. See also *United States v. Trie*, 21 F.Supp.2d 7, 19 (D.D.C. 1998) (stating, in a mail and wire fraud prosecution, that "[t]he government is not precluded from including information in the indictment used 'to place the defendant's actions in context and to establish the defendant's state of mind, intent and motives,'" quoting *United States v. Weiberger*, No. 92-235, 1992 WL

9

1  294877, *7 (D.D.C. Sept. 19, 1992))

Given that Daniel offers no explanation as to why she finds the paragraphs "prejudicial and inflammatory," and given that the government has the burden of proving that defendant executed a scheme to defraud and intended to deceive or defraud identifiable victims, the court cannot grant defendant's motion to strike substantial portions of the indictment that represent evidence of the scheme to defraud and defendant's intent to deceive. Consequently, Daniel's motion to strike paragraphs 10, 11, 13, 14, 15, 25, 28, 29 and portions of paragraph 19 is therefore denied.[30]

### C. Whether Count Five Should Be Stricken

Daniel next moves to strike Count Five because it "does not disclose violation of any law, statute or regulation by the defendant."[31] The government counters that paragraph 34 sets forth the statutory basis for the count. That paragraph reads:

---

[30] At the hearing on this motion, defense counsel argued that certain paragraphs should be stricken because the conduct alleged in those paragraphs occurred outside the relevant statute of limitations. This argument is foreclosed. See, e.g., *United States v. Pharis*, 298 F.3d 228, 234 n. 3 (3d Cir. 2002) ("mailings that fall outside the statute of limitations can be considered as evidence to prove later fraud that was within the statute of limitations"); *United States v. Wellman*, 830 F.2d 1453, 1464 (7th Cir. 1987) ("the evidence, although it related to acts which took place outside the statutory limitations period, was highly relevant to the existence of the very same scheme to defraud which the mailings in this case were alleged to have furthered. The fact that the scheme, and acts committed in furtherance of it, may have extended over a period in part barred by the statute of limitations does not mean that they are irrelevant in determining whether mailings occurring within the statutory period were in furtherance of a scheme to defraud and thus proscribed by 18 U.S.C. § 1341"). In *United States v. Beardslee*, 197 F.3d 378 (9th Cir. 1999), the defendant was charged with using fire to commit the flony of mail fraud in violation of 18 U.S.C. § 844(h). The arson fire charged occurred outside the five-year statute of limitations; the mailing that was necessary to commission of mail fraud, however, occurred within the limitations period. The Ninth Circuit held that "[a] limitation[s] period begins to run only when all the elements of the underlying offense have been committed." *Id*. at 385. Because the mailing was a necessary element of the offense, the statute of limitations did not begin to run until the mailing occurred. *Id*. at 384-85. Here, defendant is charged with two mailings that occurred within five years of the date she was indicted. Additionally, allegations regarding conduct that occurred outside the limitations period are relevant to prove intent to defraud and the existence of a scheme to defraud. For both reasons, defendant's belated argument that certain allegations should be stricken because they allege conduct outside the statute of limitations fails.

[31] Motion at 3.

10

> "Pursuant to [28 U.S.C. § 2461(c)], [18 U.S.C. § 981(a)(1)(C)], and [21 U.S.C. § 853], defendant CHRISTINE DANIEL . . ., if convicted of violating [18 U.S.C. § 1341] and/or [§ 1343] as charged in this Indictment, shall forfeit the following property . . . ."[32]

In addition, Count Five explicitly "realleges and incorporated by reference" the rest of the indictment, including the mail and wire fraud charges. The government is required under Rule 32.2 of the Federal Rules of Criminal Procedure to provide notice of its intent to seek forfeiture in the indictment. Thus, the government must include these allegations in the indictment to preserve its right to seek forfeiture of assets associated with or generated by the crime. *United States v. Dolney*, No. 04-CR-159 (NGG), 2005 WL 1076269, *4 (E.D.N.Y. May 3, 2005) (rejecting as "frivolous" a claim that forfeiture allegations "are irrelevant to the charges and are inflammatory and highly prejudicial"). Consequently, Daniel's argument that Count Five does not disclose any violation of the law is without merit.

A recent amendment to Rule 32.2(a) warrants consideration, however. Rule 32.2 of the Federal Rules of Criminal Procedure reads as follows:

> "A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute. *The notice should not be designated as a count of the indictment or information.* The indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." FED. R. CRIM. PROC. 32.2(a) (emphasis supplied).

Cf. *United States v. Lazarenko*, 504 F.Supp.2d 791, 796-97 (N.D. Cal. 2007) ("Moreover, because criminal forfeiture is not a separate, substantive charge; but is instead part of the sentence . . . , the later identification of specific forfeitable assets after conviction does not constitute an impermissible attempt to 'broaden' the indictment as Liquidators contend").

---

[32]Indictment, ¶ 34.

11

> "The [recent] amendment [of Rule 32.2] responds to some uncertainty regarding the form of the required notice that the government will seek forfeiture as part of the sentence, making it clear that the notice should not be designated as a separate count in an indictment or information. . . .
>
> Although forfeitures are not charged as counts, the federal judiciary's Case Management and Electronic Case Files system should note that forfeiture has been alleged so as to assist the parties and the court in tracking the subsequent status of forfeiture allegations." FED. R. CRIM. PROC. 32.2 Advisory Committee Note to 2009 amendments.

Because Daniel was indicted prior to the effective date of the amended rule, it is unclear that she is entitled to require that her indictment comply with it.

The order implementing the 2009 amendments to the Federal Rules of Criminal Procedure mandates that they be applied "in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending." Order Amending Federal Rules of Criminal Procedure (Mar. 26, 2009). Cf. *Langraf USI Film Products*, 511 U.S. 244, 275 n. 29 (1994) (citing rule amendments accompanied by the same language). In *Langraf*, the Supreme Court noted that "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." *Id.* at 275. This is because "rules of procedure regulate secondary rather than primary conduct," and therefore "the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive." *Id.* The Court cautioned, however:

> "Of course, the mere fact that a new rule is procedural does not mean that it applies to every pending case. A new rule concerning the filing of complaints would not govern an action in which the complaint had already been properly filed under the old regime, and the promulgation of a new rule of evidence would not require an appellate remand for a new trial. Our orders approving amendments to federal procedural rules reflect the commonsense notion that the applicability of such provisions ordinarily depends on the posture of the particular case." *Id.* at 275 n.

29 (citing Order Amending Federal Rules of Criminal Procedure, 495 U.S. 969 (1990) (stating that amendments were applicable to pending cases "insofar as just and practicable")). See also *Church v. Attorney General of Commonwealth of Virginia*, 125 F.3d 210, 213 (4th Cir. 1997) (applying *Landgraf* and concluding that a new law governing prisoner filing fees did not govern an action in which a prisoner had properly filed his action under the old regime); *Rodgers v. Deboe*, 950 F.Supp. 1024, 1029 (S.D. Cal. 1997) ("Thus, just as a new rule concerning the filing of complaints would not govern an action in which the complaint had already been properly filed, new rules concerning the mandatory payment of filing fees accompanying a properly filed complaint need not be applied here").

A particularly powerful analogy for purposes of this case is found in the Supreme Court's example that a complaint, properly filed under the old regime, should not be dismissed on the basis that it violates new procedural rules. The indictment returned in this case was properly gave notice of forfeiture under old Rule 32.2(a), as that rule contained no requirement that the indictment not charge forfeiture in a separate count.

The court is cognizant that procedural rules in the criminal context may protect important constitutional rights, and that a change in the Federal Rules may be triggered by a change in constitutional law. In *United States v. Mercado*, 349 F.3d 708 (2d Cir. 2003), cert. denied, 540 U.S. 1169 (2004), the Second Circuit considered a similar question, addressing whether amended Rule 11 of the Federal Rules of Criminal Procedure should be applied retroactively. Mercado pled guilty in September 2002, and the district court at that time did not advise him of his right to testify at trial, as required by the version of Rule 11 that became effective in December 2002. *Id.* at 709. Judge Sotomayor, then of the Second Circuit, held that "Supreme Court orders approving amendments to federal procedural rules reflect 'the commonsense notion that the applicability of such provisions ordinarily depends on the posture of the particular case.'" *Id.* at 710 (quoting *Landgraf*, 511 U.S. at 275 n. 29). "Thus," she wrote, "the determination as to whether to apply a new procedural rule in a pending case involves consideration of the effect, if any, that the rule will have on substantive rights, in light of the expenditure of judicial resources

and the inconvenience to the parties that may result from the retroactive application of the new rule." *Id.* Judge Sotomayor emphasized that the procedures prescribed by the new Rule 11 were not constitutionally mandated, and that the changes to the Rule did not reflect the recognition of new constitutional rights. She held that application of the amended Rule 11 to Mercado's case was not "just and practicable" because the guilty plea was entered prior to the effective date of the amendment and any benefit he might obtain from application of the new rule did not "outweigh the considerations of economy and finality" that militated against revisiting entered and accepted pleas. *Id.*

Applying the reasoning of *Mercado*, the court notes first that the new rule does not implicate any constitutional right; indeed the Advisory Committee Notes provide no insight into the reasoning behind the rule change other than the observation that there was "uncertainty regarding the form of the required notice." FED. R. CRIM. PROC. 32.2, Advisory Committee Notes to 2009 amendments. Indeed, it is unclear that the new rule benefits defendants in any way. Rather, the rule may be intended to benefit prosecutors by clarifying notice requirements that were previously unclear.

Were the court to strike Count Five as not compliant with new Rule 32.2(a), the government would likely supersede the indictment, which would only serve to prejudice defendant by delaying the prompt adjudication of her case. Finally, although the interest in finality is not as strong in this case as it is in a case where a court is asked to revisit an accepted guilty plea, the court is cognizant that there may be hundreds, if not thousands, of pending cases nationwide in which prosecutors properly sought indictments that alleged forfeiture as a separate count prior to December 1, 2009. It would hardly be "just and practicable" to require criminal defendants to wait longer to get to trial, to require prosecutors to return to the grand jury to supersede indictments, and to require that courts adjudicate disputes regarding application of the new rule to old indictments, when the practical effect would be that prosecutors would request the return of a superseding indictment that contained notice of forfeiture in a way that complied with new Rule 32.2.

Consequently, for the reasons stated, defendant's motion to strike Count Five is denied.

### III.  CONCLUSION

For the foregoing reasons, defendant's motion to strike is denied.

DATED: February 22, 2010

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE